FREEMAN *et al. v.* COLLIER, executrix, *et al.*

No. 16375.   OCTOBER 11, 1948.

*Thomas C. Burton* and *George L. Goode,* for plaintiffs.

*Owen & Gross* and *Kenyon, Kenyon & Gunter,* for defendants.

GROVES, Justice. (After stating the foregoing facts.) ■ The rulings on which error was assigned in the grounds of the motion for new trial numbered eight through ten, finding against exceptions filed by the plaintiffs to the auditor's report, were made on February 11, 1947. No exceptions pendente lite were taken thereto. The amendment to the motion for new trial containing these assignments of 'error was approved and order filed on June 5, 1948. Under this state of facts, these assignments of error can not be considered. "Bills of exceptions shall be tendered to the judge who presided in the cause within 20 days from the date of the decision complained of." Ga. L. 1946, Adjourned Sess., pp. 734-35, Code (Ann. Supp.), § 6-902. "Exceptions tendered before the final judgment, for the mere purpose of being made a part of the record, shall be certified to be true by the judge and ordered to be placed on the record. Such exceptions shall be tendered within 20 days from the date of the order, decision or ruling complained of." Ga. L. 1946, Adjourned Sess., p. 738, Code (Ann. Supp.), § 6-905. *Callan Court Co.* v. *Citizens & Southern Nat. Bank,* 184 *Ga.* 87 (1) (190 S. E. 831); *Beavers* v. *Williams,* 199 *Ga.* 113 (1) (33 S. E. 2d, 343).

As to the last ground of the motion for new trial, numbered eleven, it will be noticed that the only claimed error in submitting the four questions to the jury was "that the claims for furniture, repairs, attorneys' fees, and services were not sufficiently established in the evidence before the auditor to authorize their submission to the jury as questions of fact, and it was error for the court to submit the exceptions complained of in this ground to the jury for their consideration." This ground amounts only to an assignment of error on the ruling of the judge in sustaining exceptions of fact filed by the defendant, and under the ruling made in the preceding paragraph came too late.

■ It is contended by the plaintiffs that the evidence in this case failed to show either an express or an implied contract or agreement on the part of the testatrix to recompense the defendant for services rendered. Code § 3-107 provides: "Ordinarily, when one renders services or transfers property valuable to another, which the latter accepts, a promise is implied to pay the reasonable value thereof; but this presumption does not usually arise in cases between very near relatives." In order to sustain a recovery by a child against a parent for services in the nature of care and attention such as are usually bestowed because of a natural sense of duty and affection arising out of the relationship, it must affirmatively appear that the services were performed under an express contract that the parent would pay for them, or the surrounding circumstances must plainly indicate that it was the intention of the parties that compensation should be paid. *Hudson* v. *Hudson,* 90 *Ga.* 581 (16 S. E. 349); *O'Kelly* v. *Faulkner,* 92 *Ga.* 521 (17 S. E. 847). But where services are rendered by an adult daughter in attending to the business of her mother in the conduct of a hotel owned by the latter, due to the mother's infirmity, and where the services have a value materially in excess of the support received from the mother and thereby tend to enhance the mother's estate, the jury "could find from the evidence that, considering all the circumstances, both the [mother] and the daughter contemplated she should receive compensation for the services rendered; especially so in view of the character of services rendered." *Phinazee* v. *Bunn,* 123 *Ga.* 230, 231 (51 S. E. 300); *Edwards* v. *Smith,* 42 *Ga. App.* 730 (157 S. E. 348). See also *Murrell* v. *Studstill,* 104 *Ga.* 604 (30 S. E. 750); *Wall* v.

*Wall,* 15 *Ga. App.* 156 (82 S. E. 791). Under the above authorities and the undisputed testimony of the defendant, the jury were authorized to find in her favor for sixteen months' services at $250 per month. The verdict was for $4800, but the defendant voluntarily wrote off $800, and the final decree credited her with $4000 for this item.

Referring further to the general grounds of the motion, it appeared from the evidence that the testatrix, Mrs. J. O. Freeman, herself operated the Albermarle Hotel for several years prior to 1943, but that during the last several years of that time she was in bad health. From January 1, 1943, until the time of her death, her daughter, the defendant, leased the hotel from her mother, paying her $450 per month "as long as the camp was here, when she reduced it to $400," according to testimony of the defendant. She further testified: "On January 1, 1943, I leased the hotel from my mother and this lease continued until her death. Prior to January 1, 1943, I worked at the hotel, my duties were seeing after everything, all the buying, registering guests, seeing that the meals were on time, paying the employees and doing about everything. I was in this capacity for years, during the years 1942, 1941 and on back. . . I did not receive any salary for this work, but lived at the hotel and worked for my mother and her property. My mother and the other members of the family received the benefits of my work at the hotel; my mother knew I was doing the work. I consider this work at the hotel and service worth at least $250 per month over and above the keep for myself and family. After January 1, 1943, and during the period I operated the hotel under lease from my mother we made repairs to the hotel. . . My mother knew I was making these repairs, she told me to go ahead and do them. She told me she would see I was paid when the hotel was sold. She told me several times. . . I have repaired the hotel to the extent of $2382.66. Some of this was done since she died."

As to the claim for furniture, the defendant testified: "I sold them [Green and Sosebee] the hotel and my furniture. Some of the equipment in the hotel at the time was mine. . . As property included in the sale that I claim as mine, lobby furniture, leather furniture, venetian blinds, carpets, rugs, replacements of broken furniture and old furniture wearing out, carpets, drap-

eries, shades, kitchen equipment, and dining-room furniture. . . I now testify that at least $6400 worth of furniture in the hotel that was included in the sale that did not belong to my mother's estate. . . I claim that I am entitled to that money from the estate."

A. B. Collier, husband of Mrs. Lou Mae Collier, testified: "Beginning in January, 1943, me and Mrs. Collier leased the Albermarle Hotel from Mrs. Freeman and operated the Hotel from that day until her death. We made repairs to the hotel and Mrs. Freeman knew they were being made. As to what she said about paying for the repairs, Mrs. Freeman was going to sell the hotel at that time; Theo was advising it. At several times she said she would repay us when we sold it. . . Mrs. Freeman had paid out so much on expenses before that, and she had to pay some bonds and she didn't have the money to make the repairs. She said, go ahead and spend the money, and she would pay it when we sold the hotel. From the time we took over the hotel in January, 1943, until we sold the hotel, the only repairs we kept a record of was about $2600. I have a paper showing the record of money spent for supplies and labor that went into the hotel for repairs. I have the name of who I paid. This totals $2016.59. That is the amount of money paid out by myself and Mrs. Collier. We have not been reimbursed for that money, and that is a claim against the estate."

Q. "In the conveyance to Messrs. Sosebee and Green of the hotel and equipment, was any portion of that property that belonged to you and Mrs. Collier?" A. "Supposed to all belong to Mrs. Collier, she bought it." Q. "Did you have any personal furniture in the hotel?" A. "Oh yes. . . I have a list of equipment that was sold and delivered to Messrs. Sosebee & Green, belonging to me and Mrs. Collier. The list I have here is all that I can remember. It represents the people we bought the furniture from, the date and amount paid, and totals $7000 or $7100. Mrs. Collier and I paid for it. In the inventory given to Green & Sosebee there is about $5400 that belongs to us included in the inventory. These items were actually delivered to Sosebee & Green and was Mrs. Collier's property. The total that I can identify is $5441.90, which appears as defendant's exhibit D-11."

The exhibit D-11 referred to by this witness showed two series of items, with prices of each, one headed, "Furniture purchased by Mrs. A. B. C. 1943 to 1945," totalling $5441.86, the other headed, "Repairs and new equipment," and totalling $2607.50.

The plaintiff, Theo D. Freeman, testified: "I came to my mother's funeral, and the only conversation we had was that she [Mrs. Collier] wanted to buy our part and operate the hotel and carry out the will. At that time she did not present us with any inventory of the property mother possessed. . . She did not in any of these conversations make any statement that mother was indebted to her for repairs on the building or any such items as that. I have never heard of any claim that mother owed her any money for any purpose whatever. . . I went through the hotel pretty thoroughly and I couldn't say I saw anything that I understood belonged to her. The things I saw were never known to be her property. . . I was here quite frequently after my mother's illness. While she was fully conscious there was some discussion at different times about what she owed—that she was out of debt and didn't owe anybody. Mrs. Collier was present. That was around Christmas of 1944, and January 1945. . . My mother made the statement in Mrs. Collier's presence that she had no obligation except the bonds and she was hoping to live long enough to pay those off. . . These statements were made in Mrs. Collier's presence, and she didn't make any statement contradictory, or make any statement as to repairs. Mrs. Collier testified that we knew that the property was included in this deed. I did not know anything about that and never heard of it in my life. When we had the discussion in Greensboro, I never heard of her claiming anything except the electric range, the sewing machine, and the piano. . . I never heard of any other such claim until after this suit was filed. . . In the conversation at Greensboro she said she had saved lots of attorneys' fees; that she had the will probated for under $100."

B. D. Freeman testified: "I suppose I visited my mother a half dozen times a year during her illness. . . During the time I was here, my mother, Mrs. Collier, myself, and other members of the family had conversations in which she discussed her business affairs. I recall at one time when Mrs. Collier was present

statements by my mother in which she said she didn't think she would live long, but was thankful for one thing—that she didn't owe any money except for one or two bonds . . but she said that was all the indebtedness she had. That statement was made in Mrs. Collier's presence. I never heard of Mrs. Collier making any objection to these statements, or that my mother owed her for furniture. If there had been a $1000 worth of property belonging to Mr. and Mrs. Collier in the hotel, I am pretty sure I would have known it. Neither Mr. or Mrs. Collier prior to the filing of the lawsuit, made any claim to me or in my presence, that they had expended any money of their own for making repairs or for any other purpose of the hotel. Neither of them made any claim to any property as Mr. Collier testified today in the list he had presented, except he did show me a repair in the kitchen which cost about fifty dollars. . . Mrs. Collier made the statement at Greensboro that she had saved the estate some money by having the papers drawn for about $100. She made no statement that she had contracted or expected to pay $2000 attorneys' fees in connection with handling the estate. I never heard of her making any claim of that kind until after this suit was filed."

The evidence in behalf of the defendant as to the three claims, for furniture, repairs, and services, was not disputed directly by any of the plaintiffs' evidence. Such evidence of the defendant was attacked only by testimony of the plaintiffs that on several occasions when the affairs of the testatrix were being discussed the defendant made no statement as to the existence of any such claims, and that she wrote several letters to the plaintiffs regarding purchase of their interest in the estate, and in none of them was any mention made of the claims. This evidence only tended to impeach the defendant's testimony. See *Giles* v. *Vandiver*, 91 *Ga.* 192 (2) (17 S. E. 115); *Holston* v. *Southern Ry. Co.*, 116 *Ga.* 656 (2) (43 S. E. 29); *Louisville & Nashville R. Co.* v. *Bradford*, 135 *Ga.* 522 (5) (69 S. E. 870). It was not conclusive, but with other evidence introduced presented issues for determination by the jury. *Bailey* v. *Warlick*, 196 *Ga.* 642 (3), 647 (27 S. E. 2d, 322), and citations.

As to the $1000 allowed as fee for attorneys representing the defendant executrix, it can not be said that the judge abused his

discretion in overruling the motion for new trial. The value of the estate was in excess of $65,000, and the only real contention of the plaintiffs seems to be that, because the executrix stated to them that she had saved the estate money by having the will probated for a fee of only $100, the attorneys were entitled to no more. It appeared that the will was probated in solemn form, and that the necessary papers were prepared in connection with the sale of the hotel by the executrix, which she was authorized under the will to do. As executrix she was party defendant to this suit, the attorneys represented her, and the decree rendered therein adjudged that she had properly administered the estate and that the complainants had no further interest in the assets thereof. See generally, in this connection, *Clements* v. *Fletcher,* 161 *Ga.* 21 (3d) (129 S. E. 846); *Reynolds* v. *Dorsey,* 192 *Ga.* 538 (1) (15 S. E. 2d, 779).

The court did not err in overruling the motion for a new trial.

*Judgment affirmed. All the Justices concur, except Duckworth, C. J., who dissents from headnote 2 and the corresponding division of the opinion and from the judgment of affirmance, and Bell, J., absent on account of illness.*